# Obligating Carryover Funds in Violation of OMB Zero-Dollar Apportionment Rule

At least in circumstances where an agency fails to submit an apportionment request for carryover funds to the Office of Management and Budget before the start of a fiscal year, the automatic zero-dollar apportionment effected by section 120.57 of OMB Circular A-11 is a valid apportionment for purposes of the Anti-Deficiency Act. As a result, in such circumstances, 31 U.S.C. § 1517 would prohibit an agency from expending or obligating funds exceeding that apportionment of zero.

September 29, 2016

MEMORANDUM OPINION FOR THE
ASSISTANT GENERAL COUNSEL
ADMINISTRATION AND TRANSACTIONS
DEPARTMENT OF COMMERCE

For purposes of federal fiscal law, an "apportionment" specifies the amount of money in an appropriation account an agency can obligate or expend during a particular period of time, or on a particular project or function. *See* 31 U.S.C. § 1512. The Anti-Deficiency Act ("ADA" or "Act") gives the President the authority to apportion the appropriations available to federal agencies. *Id.* § 1513(b)(1). The President has delegated this authority to the Office of Management and Budget ("OMB"). Exec. Order No. 6166, § 16 (June 10, 1933), *as amended by* Exec. Order No. 12608, § 2 (Sept. 9, 1987), 3 C.F.R. 245 (1987 comp.). The ADA also provides that United States Government officers and employees may not make or authorize expenditures or obligations of funds "exceeding . . . an apportionment." 31 U.S.C. § 1517(a)(1). You have asked whether an official would violate this provision of the Act if she obligated appropriated funds in violation of an OMB rule that automatically apportions certain kinds of funds in the amount of zero dollars.[1]

---

[1] *See* Letter for Karl Remón Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Rafael A. Madan, Acting Assistant General Counsel for Administration, Department of Commerce (Sept. 18, 2015) ("Commerce Letter"). In preparing this opinion, we also received the views of OMB. *See* Letter for Karl Remón Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Ilona Cohen, General Counsel, Office of Management and Budget (Jan. 8, 2016) ("OMB Letter"). At our request, both the Department and OMB supplemented their initial views

The OMB rule at issue, which appears in section 120.57 of OMB Circular A-11,[2] imposes an automatic zero-dollar apportionment for carryover funds—i.e., unobligated balances that remain available from a prior fiscal year—until and unless OMB issues an account-specific apportionment for the same funds. You have explained that, in your view, while OMB's rule is formally structured as an apportionment, it is in effect a prohibition on agencies' obligating carryover funds in advance of later, account-specific apportionments. As you point out, the text of the ADA suggests, and at least one federal court of appeals has held, that while the ADA expressly forbids obligations in advance of appropriations, it does not similarly bar obligations in advance of apportionments. Relying on that reading of the ADA, you contend that section 120.57 improperly eliminates this distinction between appropriations and apportionments under the Act; converts a violation of an administrative rule that temporarily precludes the use of funds pending an account-specific apportionment into a full-blown ADA violation; and wrongly imposes ADA penalties on agencies for using carryover funds even after they have made clear that there is a programmatic need to use them. OMB disagrees, explaining that in its view, section 120.57 constitutes a fully valid apportionment that "achieve[s] the most effective and economical use" of carryover funds, as the ADA itself requires. *See* 31 U.S.C. § 1512(a). As a result, OMB asserts, any obligation or expenditure made in excess of the zero-dollar apportionment set forth in section 120.57 would violate the ADA.

As explained in more detail below, we conclude that, at least in circumstances where an agency fails to request a non-zero apportionment of carryover funds before the start of a fiscal year, section 120.57 effects a valid apportionment for purposes of the ADA. Nothing in the ADA for-

---

by e-mail. *See* E-mail for Daniel L. Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Angelia Talbert-Duarte, Department of Commerce, *Re: DOC Opinion Request* (Feb. 12, 2016, 9:36 AM) ("Talbert-Duarte E-mail"); E-mail for Daniel L. Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Heather V. Walsh, Office of Management and Budget, *Re: DOC Opinion Request* (May 12, 2016, 9:37 AM) ("Walsh E-mail"); E-mail for Daniel L. Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Andrea Torczon, Department of Commerce, *Re: DOC Opinion Request* (June 2, 2016, 9:57 AM) ("Torczon E-mail").

[2] OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget* (July 2016) ("Circular A-11"), https://www.whitehouse.gov/sites/default/files/omb/assets/a11_current_year/a11_2016.pdf.

bids automatic zero-dollar apportionments, or requires OMB to issue account-specific apportionments in non-zero amounts. And even if the requirement that OMB apportion carryover funds to achieve "the most effective and economical use" of those appropriations imposes a substantive standard whose violation could render an apportionment ineffective under the ADA, we believe OMB's application of section 120.57 in the circumstances described above would meet that "effective and economical use" standard. Further, under such circumstances, we do not think automatically imposing a zero-dollar apportionment on carryover funds impermissibly eliminates any feature of the ADA, improperly punishes violations of an administrative rule, or improperly imposes ADA penalties on agencies obligating or expending funds at a time when the ADA suggests that they should be able to use them. As a result, in the circumstances described, an agency's obligation of carryover funds in excess of the rule's zero-dollar apportionment would be an expenditure "exceeding . . . an apportionment" in violation of the ADA.

This opinion has two parts. In Part I, we discuss the relevant statutory and factual background. In Part II, we explain our reasons for concluding that section 120.57 effects a valid apportionment under the ADA.

## I.

### A.

The Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Anti-Deficiency Act "reinforces and elaborates on this constitutional limitation." Memorandum for Judith R. Starr, General Counsel, Pension Benefit Guaranty Corporation, from Troy A. McKenzie, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Whether the Pension Benefit Guaranty Corporation May Enter Into and Incrementally Fund Multiyear Leases Exceeding Five Years* at 3 (Sept. 30, 2015). A key provision of the Act, 31 U.S.C. § 1341, states that officers and employees of the United States Government may not "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation," or "involve [the] government in a contract or obligation for the payment

of money before an appropriation is made unless authorized by law." *Id.* § 1341(a)(1)(A), (B).

The ADA also requires appropriated funds to be "apportioned." *Id.* § 1512(a). As suggested above, apportionment is "an administrative process by which . . . appropriated funds are distributed to agencies in portions over the period of their availability." 2 Government Accountability Office ("GAO"), *Principles of Federal Appropriations Law* 6-116 (3d ed. 2006) ("*Federal Appropriations Law*").[3] The purpose of apportionment is "to minimize the potential for engaging in expenditures that exceed congressional appropriations." *United States Marshals Service Obligation to Take Steps to Avoid Anticipated Appropriations Deficiency*, 23 Op. O.L.C. 105, 106 (1999). Consistent with that goal, the ADA requires "appropriation[s] available for obligation for a definite period" to be apportioned "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period," and "appropriation[s] for an indefinite period"—the kind of appropriation at issue here—to be apportioned "to achieve the most effective and economical use" of those appropriations. 31 U.S.C. § 1512(a).

As noted above, the President has the responsibility to make written apportionments for the Executive Branch, *id.* § 1513(b)(1), and has delegated this responsibility to OMB, Exec. Order No. 6166, § 16. In exercising this delegated authority, OMB has the discretion to apportion funds by time periods, activities, functions, projects, objects, or some combination thereof. 31 U.S.C. § 1512(b)(1)–(2). In the case of carryover funds—i.e., "unobligated balances that are available from the prior fiscal year(s) in multi-year and no-year accounts," Circular A-11, *supra* note 2, § 120.2—the ADA requires agency heads to submit apportionment requests to OMB no later than forty days before the beginning of the next fiscal year. 31 U.S.C. § 1513(b)(1)(A). OMB, in turn, must apportion the funds not later than twenty days before the start of the fiscal year. *Id.* § 1513(b)(2)(A).

---

[3] Although the legal interpretations and opinions of the GAO and the Comptroller General are not binding on Executive Branch agencies, they "'often provide helpful guidance on appropriations matters and related issues.'" *State and Local Deputation of Federal Law Enforcement Officers During Stafford Act Deployments*, 36 Op. O.L.C. 77, 89 n.8 (2012) (quoting *Applicability of Government Corporation Control Act to "Gain Sharing Benefit" Agreement*, 24 Op. O.L.C. 212, 216 n.3 (2000)).

In a provision that resembles, but does not fully parallel, section 1341's prohibition on expenditures and obligations in excess or advance of appropriations, section 1517 of title 31 states that government officers and employees "may not make or authorize an expenditure or obligation *exceeding* . . . an apportionment." *Id.* § 1517(a)(1) (emphasis added). Unlike section 1341, section 1517 does not also expressly bar entering into a contract or making an obligation *before* an apportionment is made. In light of the textual difference between these provisions, at least one federal court of appeals has held that while the ADA prohibits expenditures that "exceed" an existing apportionment, it does not prohibit expenditures made in advance of a later apportionment. *See Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1451 (Fed. Cir. 1997). Agency heads must report violations of section 1517 immediately to the President and Congress, and transmit a copy of those reports to the Comptroller General. 31 U.S.C. § 1517(b). Officials who violate the section are subject to administrative and criminal penalties, including suspension without pay, removal from office, and, in the case of knowing and willful violations, a fine and possible imprisonment. *Id.* §§ 1518, 1519.

Circular A-11 implements the ADA's apportionment provisions by giving instructions to agencies about the apportionment process. Section 120.57 of the Circular addresses the apportionment of carryover funds. That provision, in question-and-answer form, states:

> Must I request that funds apportioned in one fiscal year be apportioned in the next fiscal year if the funds were not obligated and remain available?
>
> Yes. When budgetary resources remain available (unexpired) beyond the end of a fiscal year, you must submit a new apportionment request for the upcoming fiscal year. You cannot incur obligations in any year absent an approved apportionment for that year. For instance, if OMB apportioned $1 million for a no-year [account] in [Fiscal Year ("FY")] 2012 and you obligated no funds, you must still submit an FY 2013 request and receive OMB approval of that request before incurring obligations in FY 2013. Until you receive a written apportionment from OMB, the amount of carryover apportioned is zero dollars. In addition, apportioned anticipated or estimated resources are not available for obligation until the resources are realized.

Circular A-11, § 120.57. Circular A-11 contrasts the apportionment effected by section 120.57, as well as other kinds of "automatic apportionments," with "written apportionments" in which OMB approves an agency's request for an apportionment in a specific amount. *Id.* § 120.2.[4] OMB also sometimes refers to these "written apportionments" as "account-specific apportionments." *See* OMB Letter at 2.

## B.

We understand that your request for advice was prompted by a situation that arose during Fiscal Year 2014 involving the National Oceanic and Atmospheric Administration ("NOAA"), an operating unit within the Department of Commerce ("Department"). NOAA has a no-year fund called the "Fisheries Enforcement Asset Forfeiture Fund" ("Fisheries Enforcement AFF" or "Fund"), which consists generally of sums received by NOAA as fines, penalties, and forfeitures of property for violations of marine resource laws, along with transferred amounts that are "available until expended." *See* Department of Commerce Appropriations Act, 2012, Pub. L. No. 112-55, div. B, § 110, 125 Stat. 552, 591, 602 (2011) (establishing the Fund).[5] Because Fiscal Year 2014 began on October 1, 2013, OMB's statutory deadline to apportion the unobligated carryover amounts in the Fund fell on September 11, 2013. *See* 31 U.S.C. § 1513(b)(2)(A). In anticipation of that deadline, the ADA required the Department to submit an apportionment request to OMB by August 22, 2013. *See id.* § 1513(b)(1)(A). NOAA submitted an initial request to the Department's internal Office of Budget ("OB") in August. Commerce Letter at 2. However, due to subsequent back-and-forth between OB and NOAA, the Department did not submit its apportionment request to OMB until December 2013. *Id.* OMB approved a final version of the apportionment request several months later, on April 11, 2014. *Id.* This final

---

[4] As Circular A-11 explains, "[a]n *automatic apportionment* is approved by the OMB Director in the form of a Bulletin or provision in Circular A-11, and typically describes a formula that agencies will use to calculate apportioned amounts. An automatic apportionment is in contrast to the written apportionments, which typically include specific amounts, and which are approved by an OMB Deputy Associate Director (or designee)." *Id.* § 120.2.

[5] A no-year appropriation is an appropriation "that is available for obligation for an indefinite period." 1 *Federal Appropriations Law* at 2-14 (3d ed. 2004).

version apportioned the unobligated carryover funds in the Fisheries Enforcement AFF by project. *Id.* The apportionment therefore nominally covered the full fiscal year, even though two quarters of that year had already passed when the apportionment was approved. Until OMB issued this account-specific apportionment in April, however, section 120.57 of Circular A-11 was in effect with respect to the relevant funds. As a result, between October 1, 2013, and April 11, 2014, NOAA was operating under an automatic zero-dollar apportionment for the Fisheries Enforcement AFF. NOAA nonetheless "obligated" funds from the Fisheries Enforcement AFF during Fiscal Year 2014 "before the [account-specific] apportionment was issued." *Id.* "The total Fisheries Enforcement AFF obligations during that time," however, "did not exceed the final apportionment amount for FY 2014" that OMB approved in April. *Id.*

Your opinion request asks us to address whether an agency official violates section 1517 when she obligates funds in violation of OMB's automatic zero-dollar apportionment under the circumstances just described. *Id.* at 1, 4 ("I am charged with determining whether NOAA's violation of OMB's rule, [section] 120.57 of OMB Circular A-11, of itself constitutes a violation of the ADA."). As in prior situations involving ADA questions prompted by past conduct, we decline to address whether particular past actions violated the ADA. *See Online Terms of Service Agreements with Open-Ended Indemnification Clauses Under the Anti-Deficiency Act*, 36 Op. O.L.C. 112, 114 (2012). We will, however, use the features of the scenario you have described to provide general guidance in response to your question. *See id.*

## II.

As noted above, section 120.57 states in relevant part that "[u]ntil [an agency] receive[s] a written apportionment from OMB, *the amount of carryover apportioned* [for a given fiscal year] *is zero dollars.*" Circular A-11, § 120.57 (emphasis added). By its terms, this provision purports to make a default, automatic apportionment of zero dollars in carryover funds until and unless an agency receives a different written apportionment from OMB. Section 120.57 is thus, as OMB explains, an exercise of its delegated statutory authority to apportion appropriations. *See* OMB Letter at 2 ("[Section] 120.57[] is . . . an application of 31 U.S.C. § 1513, which requires that the President (and, by delegation, OMB) apportion

appropriations."). Assuming section 120.57 is a valid exercise of that authority, it would appear straightforward to conclude that obligations or expenditures made in excess of this zero-dollar apportionment would violate the ADA. *See* 31 U.S.C. § 1517(a)(1).

And on its face, the automatic apportionment in section 120.57 does not exceed the limits of OMB's authority to apportion funds under the ADA. Nothing in the ADA, and no other authority of which we are aware, prevents OMB from using categorical rules that operate automatically to apportion funds in preset amounts, or requires it to issue apportionments on an account-specific basis. Indeed, OMB often relies on automatic, categorical apportionments: another provision of the Circular automatically apportions newly enacted full-year appropriations on a pro rata basis, *see* Circular A-11, § 120.41, and OMB frequently issues automatic apportionments of amounts provided in continuing resolutions, *see, e.g.*, OMB Bulletin No. 15-03, *Apportionment of the Continuing Resolution(s) for Fiscal Year 2016* (Sept. 30, 2015), https://www.whitehouse.gov/sites/default/files/omb/bulletins/2015/15-03.pdf (last visited ca. Sept. 2016); *see also* 2 *Federal Appropriations Law* at 6-141 (3d ed. 2006) (noting OMB's practice of issuing automatic apportionments in the context of continuing resolutions). We are likewise aware of nothing in the ADA that would preclude OMB from apportioning carryover funds in the amount of zero dollars in the circumstances at issue here.[6] And while the ADA does require apportionments to be "in writing," 31 U.S.C. § 1513(b)(1), OMB's automatic-apportionment rules—including the one that appears in section 120.57—satisfy this requirement, because they are set forth in writing in Circular A-11 or in OMB Bulletins.

---

[6] The ADA does provide that "[i]n apportioning or reapportioning an appropriation, a reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." 31 U.S.C. § 1512(c)(1). However, we understand that OMB has never considered the zero-dollar apportionments of carryover funds effected by section 120.57 to create "reserves." As discussed below, *see infra* p. 98, the purpose of the zero-dollar apportionment in section 120.57 is not to "set aside" budgetary resources that might otherwise be used, or be required to be used, in order to "provide for contingencies," "effect savings," or for some other purpose. GAO, *A Glossary of Terms Used in the Federal Budget Process* 25 (Sept. 2005) (defining "reserve"). Rather, the purpose of section 120.57 is simply to ensure that carryover funds will not be used during those portions of their period of availability when they are not needed.

Automatic apportionments further the purposes of the ADA by (among other things) helping OMB meet the deadlines set forth in that statute. As we explained above, the ADA requires OMB to apportion appropriated funds by a set date—in the case of carryover funds, no later than twenty days before the beginning of the fiscal year for which those funds are available. By requiring apportionments to be in place before the fiscal year starts, these deadlines help ensure that the underlying purposes of the apportionment process are served—"prevent[ing] obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period" in the case of time-limited appropriations, and ensuring that appropriations are used "effective[ly] and economical[ly]" in the case of appropriations available for an indefinite period. 31 U.S.C. § 1512(a). Automatic apportionments make it possible for OMB to meet these statutory deadlines even when doing so would otherwise be difficult, such as when Congress provides temporary funding for agency operations through short-term continuing resolutions, or when an agency fails to submit a specific apportionment request prior to the statutory deadline. *See* Walsh E-mail.

As was just noted, 31 U.S.C. § 1512(a) requires OMB to apportion appropriations for an indefinite period to achieve "the most effective and economical use" of those appropriations. *See also* 2 *Federal Appropriations Law* at 6-121 (3d ed. 2006) (identifying this provision as the applicable requirement for no-year funds). OMB agrees that "[a]ll apportionments, including the one in section 120.57, are subject to the requirements of section 1512(a)." Walsh E-mail. It is less clear that if an OMB apportionment failed to meet these requirements, it would then be invalid, such that agencies could make obligations or expenditures in excess of the purported apportionment without violating the ADA. We need not resolve this question, however, because we believe that application of the automatic zero-dollar apportionment in section 120.57 in the circumstances at issue here satisfies the "effective and economical use" standard.

To begin with, in requiring every appropriation to be apportioned by certain time periods, projects, or a combination thereof, 31 U.S.C. § 1512(b)(1), the ADA makes clear that the official designated to make an apportionment subject to those requirements must do so "as the official considers appropriate," *id.* § 1512(b)(2). The ADA thus gives OMB substantial discretion in making each apportionment, consistent with the

requirement that the apportionment achieve the most effective and economical use of the funds. And we think that OMB's exercise of this discretion in section 120.57 was sound. OMB has explained that when an agency "has not requested the use of carryover funds at the beginning of the fiscal year"—as was the case with respect to the Fisheries Enforcement AFF—OMB presumes that the agency "has no present programmatic need for [those] funds." Walsh E-mail. In our view, it is reasonable for OMB to assume both that agencies are best positioned to evaluate their own fiscal needs, and that they have an incentive to seek any necessary funds for their own operations. It is also reasonable for OMB to assume that agencies understand that the ADA itself requires them to submit apportionment requests for carryover funds forty days prior to the start of a fiscal year, and requires OMB to complete the apportionments twenty days later. *See* 31 U.S.C. § 1513(b)(1)(A), (b)(2)(A). In light of these considerations, we think it is similarly reasonable to presume that if an agency fails to request funds before the start of a fiscal year, it has no present need for those funds. And in that situation, it makes further sense that imposing a default zero-dollar apportionment would not only allow OMB to comply with its statutory apportionment deadline, but also achieve the most "effective and economical use" of the relevant carryover funds, by ensuring that they are not used during a period when they are not needed.[7]

As we understand its position, the Department does not dispute that section 120.57 is, by its terms, an "apportion[ment]." Circular A-11, § 120.57; *see, e.g.*, Talbert-Duarte E-mail ("[W]e recognize that OMB structured § 120.57 as an apportionment of zero."). Rather, we take the Department's argument to be that, whatever its formal structure, the substantive effect of section 120.57 is to prevent agencies from obligating or expending funds in advance of an account-specific apportionment.

---

[7] Because we consider only the application of section 120.57 in circumstances where an agency has failed to submit an apportionment request for carryover funds before the start of a fiscal year, we express no view on whether OMB could justify an automatic apportionment of zero dollars by operation of section 120.57 under any other circumstances, including where an agency submits an apportionment request by the agency's forty-day deadline, where the agency submits a request after the forty-day deadline but before OMB's twenty-day deadline, or where the agency submits its request after OMB's twenty-day deadline but before the start of the fiscal year.

*See* Commerce Letter at 1 (Although "[the] OMB prohibition is structured as an automatic apportionment of carryover amounts at zero," "[a]s a consequence of this structure, an agency official who obligates funds in advance of an apportionment violates the OMB rule by exceeding the automatic apportionment amount of zero."); Talbert-Duarte E-mail ("From the perspective of an agency official to whom the [apportionment rule in section 120.57] applies, the purpose and effect of the rule is the same—there can be no obligation before there is an apportionment of an actual dollar amount."). According to the Department, this is problematic for three reasons, which we consider in turn.

First, the Department contends that, by creating a situation in which agencies can never obligate carryover funds before they are apportioned, "the statutory distinction between [section] 1341"—which prohibits obligations and expenditures both in advance and in excess of appropriations—"and [section] 1517"—which prohibits obligations and expenditures only in excess of apportionments—"is entirely erased." Talbert-Duarte E-mail; *see id.* (noting that OMB itself states that "[b]y operation of § 120.57, an agency will never be in 'advance of' an apportionment of carryover, because it will always have an apportionment" (quoting OMB Letter at 2)). This argument rests on the premise that, as the Federal Circuit has held, section 1517 does not bar obligations or expenditures in advance of an apportionment. *See Cessna Aircraft*, 126 F.3d at 1451. We will assume for purposes of this opinion that this conclusion is correct. Even with this assumption, we do not think the Department's argument is convincing. The Department in effect asserts that the ADA prevents OMB from creating a situation in which an agency will never find itself without an apportionment, because it would then never have the opportunity to obligate or expend funds in advance of an apportionment. But as we explained above, nothing in the ADA bars automatic apportionments, requires that apportionments be account-specific, or requires that apportionments always be made in non-zero amounts. *See supra* p. 97. Thus, so long as an automatic apportionment meets the standards for apportionment in the ADA, *see supra* p. 98 (discussing standards), it is a valid apportionment, even if it precludes agencies from ever being without an apportionment. Indeed, such a result seems fully consistent with the ADA's statutory design. As discussed earlier, Congress specifically created deadlines for apportionments of carryover funds, seeking to ensure

that they would be completed before the start of any fiscal year. If agencies and OMB adhered to their statutory deadlines, there would—at least in the ordinary course—never be a situation in which an agency had available carryover funds without an apportionment. Thus, the mere fact that OMB has created an automatic-apportionment mechanism that ensures that an apportionment will always be in effect does not by itself make section 120.57 invalid, and in fact accords with congressional design.

The Department's second argument is that section 120.57 should be considered a kind of administrative rule that "temporarily precludes the use of funds as a matter of administrative control" while enabling "OMB to comply with [its statutory] deadlines," rather than an "apportionment that prescribes [the relevant funds'] use in definite amounts by time periods or activities"—violation of which would trigger potential penalties under the ADA. Torczon E-mail. The Department appears to suggest that, if an OMB rule is merely designed to temporarily prevent agencies from using funds for purposes of administrative control and to ensure OMB's own ADA compliance, rather than to actually apportion funds under the standards set forth in the ADA, it would not be appropriate to subject agency officials to ADA penalties for violating that rule. *Cf.* Talbert-Duarte E-mail ("[T]he question we are raising does not concern a 'zero dollar' apportionment in a specific situation where programmatic needs dictate that amounts are not necessary for a particular time period. Our question concerns only the automatic, across-the-board application of [section] 120.57."); Torczon E-mail (While "agencies and OMB are required to comply with the time deadlines established for submitting and approving apportionments," "[a] violation of the deadlines . . . is not a reportable violation of the [ADA], and we question the appropriateness of factoring the deadlines into the analysis of the issue we raise regarding a reportable violation of section 1517."). We need not decide whether a rule that merely precluded the use of funds as a matter of administrative control and deadline compliance would be a valid apportionment under the ADA, however, because, at least as applied in situations where an agency fails to submit an apportionment request before the start of a fiscal year, we do not believe section 120.57 is such a rule. For the reasons explained above, *see supra* pp. 96–99, OMB's automatic zero-dollar apportionment for carryover funds complies with the ADA's formal

requirements for apportionments, and represents a reasonable exercise of OMB's apportionment discretion. If an agency fails to request an apportionment before the start of a fiscal year, it is reasonable to presume that the agency has no programmatic need for the relevant funds during that year. There is thus no basis to conclude that a rule setting a zero-dollar apportionment in such a situation is merely an administrative control measure that prevents obligations and expenditures until OMB has time to make an account-specific apportionment.

Finally, the Department argues that OMB's "blanket presumption of no programmatic need" is "inapposite in at least many cases where an agency is actively engaged in the apportionment process with OMB." Torczon E-mail. The Department acknowledges that, in the situation involving NOAA that gave rise to its opinion request, "internal revisions and delays within the Department . . . caused the [proposed Fisheries Enforcement AFF] apportionment to be submitted late to OMB." *Id.* But it points out that "issues raised by sequestration (among other things) delayed the apportionment further for several months *after* submission to OMB." *Id.* OMB's rationale for its zero-dollar apportionment, the Department suggests, may make sense prior to the point at which an agency makes a request for a non-zero apportionment, but not during the period *after* such a request is made, but before the account-specific apportionment process is completed. *See id.* The Department thus contends that, whether because OMB's rule would not "achieve the most effective and economical use" of the funds during that period, or because the rule would impermissibly undermine Congress's decision not to subject obligations and expenditures in advance of apportionments to ADA penalties, violation of the rule after a request has been submitted should not give rise to penalties under the ADA. *See id.*

Again, we disagree. For the reasons we have explained, it is in our view reasonable for OMB to presume that, if a request for a non-zero apportionment of carryover funds is not pending at the start of a fiscal year, the agency has no current need for those funds. An agency's belated request for a non-zero apportionment might call into question the continuing factual accuracy of OMB's assumption after the request is made. But we do not think such a belated request somehow undermines the validity of the initial default apportionment. The ADA itself makes the start of each fiscal year the critical time for making apportionments for carryover

funds. *See* 31 U.S.C. § 1513(b)(2)(A). It is therefore reasonable for OMB to set apportionments based on its analysis of the appropriate apportionment as of the start of the fiscal year. The ADA does reflect the possibility that circumstances might change during a fiscal year, by requiring OMB to review apportionments at least four times a year. *See id.* § 1512(d). But the ADA does not provide any specific instructions about what OMB must do if it determines that an apportionment is no longer appropriate after one of its reviews, let alone provide a specific timeline for providing a revised apportionment. The Act thus appears to leave those matters to OMB's discretion to "apportion an appropriation . . . as [it] considers appropriate." *Id.* § 1512(b)(2). In light of that discretion and the statutory focus on the start of the fiscal year, we do not think the passing of several months between an agency's belated apportionment request for carryover funds and OMB's issuance of a new account-specific apportionment would render the original, default apportionment invalid at any point during the period in which the belated request was pending.[8]

## III.

For the reasons set forth above, we conclude that, at least in circumstances where an agency fails to submit an apportionment request for carryover funds before the start of a fiscal year, the automatic zero-dollar apportionment in section 120.57 of OMB Circular A-11 is a valid appor-

---

[8] The Department also argues that, in light of the potential penalties involved, the question whether violation of section 120.57 constitutes an ADA violation "should be examined with an eye to the familiar rule of statutory construction commonly known as the rule of lenity." Commerce Letter at 3–4; *see also Use of Appropriated Funds to Provide Light Refreshments to Non-Federal Participants at EPA Conferences*, 31 Op. O.L.C. 54, 69 (2007) (explaining that the rule of lenity holds that "if ambiguity remains in a criminal statute after textual, structural, historical, and precedential analyses have been exhausted, the narrower construction should prevail"). However, we do not believe this question involves sufficient statutory ambiguity to justify application of the rule of lenity. Rather, for the reasons explained above, we think it clear that, applying ordinary tools of statutory construction to the relevant provisions in the ADA, section 120.57 effects a valid apportionment under that statute. *See Lockhart v. United States*, 136 S. Ct. 958, 968 (2016) ("We have used the lenity principle to resolve ambiguity in favor of the defendant only . . . when the ordinary canons of statutory construction have revealed no satisfactory construction.").

tionment for purposes of the ADA. As a result, in such circumstances, 31 U.S.C. § 1517 would prohibit an agency from expending or obligating funds exceeding that apportionment.

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*